Moncure, P.,
delivered the opinion of the j court.
1. The court is of opinion that Robert i Gibboney, trustee in the deed from Thomas , L,. Preston and wife, bearing date the 7th 1 day of July, 1859, in the proceedings in this j cause mentioned, was fully empowered by; t'he said deed to make the sale, which, as such trustee, he made to W. Alexander ; Stuart, George W. Palmer and George B. Parker, by an agreement under thp hands ; and seals of the parties, bearing date the JOth day of June, 1862, in the said proceedings also mentioned.
Bj>- the said deed the grantors conveyed to the said trustee “all that tract or parcel of land lying in the county of Smyth, on the waters of the North Polk of Holston, and commonly known as the Preston Salt Works estate, with all the appurtenances and appendages thereto belonging, and containing six thousand nine hundred and ninety-five acres, be the same more or less; all their right, title, claim and interest at law, as in equity, in and to the tract of land lying in the county of Washington, adjoining the first mentioned tract, and commonly known as the King’s Salt Works estate, with all the appendages and *appurtenances thereto belonging, and containing five thousand two hundred and fifty-six acres, be the same more or less;” and a great many other tracts and lots of land de- ; scribed in the said deed, and a great many slaves and dioses in action, and a great deal of other personal property therein described. After which description the deed thus proceeds:
“It is the express intention and desire of j the parties of the first part to convey to the ¡ party of the second part (the said trustee) ! all their real and personal estate of every description, wherever situated, and if through inadvertence or mistake anything may have been omitted in the foregoing enumeration and description of property, the same is hereby as fully and absolutely conveyed to the party of the second part as if it had been specifically mentioned; all debts and choses in action which it is impossible to specify, as many are in the hands of agents, the names of obligors and the amounts, the parties of the first part cannot now here more particularly designate:
“In trust to secure the just creditors, and to indemnify the sureties of the said Thomas R. Preston in manner and form, and with the priorities hereinafter set forth and provided in this deed.
“1st. To sell either at public or private sale, and upon such terms as, in the opinion of the party of- the second part, will best promote the objects expressed in this deed, and convey the same, the said Preston Salt Works estate, and from the proceeds of sale to pay, satisfy and discharge the following encumbrances and liens now resting upon said estate:
“John S- Preston, about - - - $110,000
“William C. Preston, about - - 25,000
“Mrs. Sally B. Floyd, about 12,000
estate of Gov. James McDowell, dec’d, about - 13,000
“Mrs. Sally P. Miller, about - - 3,500
“Wade Hampton, about - - - 12,000
“Philip St. George Cocke, about 50,000
“Secondly. After the payment and satis-faefion of the said encumbrances above recited upon the said Preston Salt Works estate, it is expressly understood between the parties to this deed, that for and in consideration of the relinquishment of the right to dower in the real estate hereby conveyed by Anna M. Preston, the sum of $25,000 is to be raised and set apart out of the surplus remaining in the hands of the party of the second part, after payment of the said encumbrances upon the said Preston’s Salt Works estate, and from the residue of the real estate hereby conveyed, and paid over by the said party of the second part to Peter Saunders, the brother of the said Anna M. Preston, who is hereby appointed trustee for that purpose, for the sole use and benefit of the said Anna M., untrammelled by the obligations and free from the control of her husband, the said Thomas R. Preston, neither liable for any debts the said Thomas R. may now owe, or may hereafter contract.
“Thirdly. To sell, either at public or private sale, the real and personal estate hereby conveyed, upon such terms, with the reservations and exceptions hereinbefore made, as in the opinion of the party of the second part may best promote the objects set forth in this deed, and convey the same; and after payment of the sums mentioned in the first and second clauses of this deed, and after discharging such debts as may now operate as liens, either by judgment or otherwise, thereon, the party of the second part shall pay to the South Western Bank of Virginia, *438 at Wytheville, a debt due by negotiable note *of about $5,300, which said note is endorsed by V. S. Morgan and P. C. Buchanan.”
Then follows an enumeration of many other debts, no doubt being all the debts of said Thomas L. Preston, for which others were bound as his endorsers or sureties; at the end of which enumeration the deed proceeds in these words:
“In the event of the proceeds in the hands of the party of the second part, after the payment of the encumbrances on the real estate provided for in the first clause, and the payment to Peter Saunders, Jr., trustee for the benefit of Mrs. Anna M. Preston, provided for in the second foregoing clause, shall not be sufficient to pay and discharge all the debts secured in the third clause, then the party of the second part is to pay and discharge the debts enumerated in the said third clause pro rata.
“Fourthly. After payment of the foregoing enumerated and specified liens and debts with the reservations and exceptions hereinbefore made, to pay : .
“A debt due Richard T. Davis by bond dated the •— of —, 18 — , of about seven thousand dollars.”
Then follows an enumeration of a great many other debts, no doubt being all the debts of said Thomas B. Preston that could be remembered by him. After which are several other clauses, among which are the following, to-wit:
“The parties of the first part, confiding in the diligence, skill and ability of the party of the second part, and being desirous to render the trust fund hereby conveyed ample for the payment and satisfaction of the liens, obligations and debts herein secured, with the least possible delay, hereby authorize and empower the said party of the second part in the management and control of the said trust fund, to exercise a sound discretion, subject only to the provisions heretofore made.
*“In the event the proceeds of the sale of the property hereby conveyed, after paying the encumbrances and liens enumerated in the first clause, upon the real estate, the payment provided for in the second clause to Peter Saunders, Jr., trustee for Anna M. Preston, and the debts to which priority is given in the third clause, shall be insufficient to pay and discharge all the debts enumerat-d in the fourth clause, then the said party of the second part shall, _out of the proceeds, pay thé debts enumerated in the fourth clause pro rata.”
Thus it appears that the most ample powers and enlarged discretion are conferred on the trustee by the deed of trust, and the power to sell, either at public or private sale, is thereby expressly given.
2. The court is further of opinion that there was no fraud in regard to the said sale on the part either of the trustee or of the said purchasers, or either of them.
As to the said trustee, Gibboney, he was a gentleman of the highest character for integrity, for capacity for business, for diligence, promptness and punctuality, and on account of all those traits, which he possessed in so eminent a degree, he was selected by the grantor in the deed, the said Thomas L,. Preston, by the advice and recommendation of his friends, to be the trustee in the said deed to execute the most important and difficult trusts thereby created, and was invested, as we have seen, with almost unlimited discretion and powers for that purpose. “Confiding implicitly,” as the said Preston says in his bill, “in the fidelity and integrity of. his said trustee, and believing, as did those whom he consulted upon his affairs, that Mr. Gibboney was one of the most discreet and sagacious financiers of that portion of Virginia, your orator placed everything 'in his hands, divesting himself of all super- ' vision of his property, and from any chance of receiving any revenue from the *same, agreeing to allow the trustee a commission of three per cent, upon his receipts, which it was known would be very large, and clothing him with well nigh unlimited power — power at least broad enough to cover any fair and honest contract which his trustee might be called upon to enter into in the proper and faithful discharge of his important trust.”
This high character of the trustee, admitted by the plaintiff Preston himself in the bill, is fully sustained by the evidence in the cause. General Terry, a witness for the defendants, who had long known him and been intimate with him, says in his deposition: “I regarded him as one of the most punctual, accurate and reliable business men of my acquaintance, and I think this was the estimate in which he was generally held. He had been a very active business man and was very systematic. At the time of his death he was a member of the Virginia legislature.” Joseph W. Caldwell, another witness for the defendants) concurs in the said statement of General Terry. Beverley R. Johnston, another witness for the defendants, says: “I was particularly well acquainted with the character and business habits of Robert Gibboney. I knew him from boyhood, and had the fulliest opportunities for knowing and appreciating his character and business habits and capacity during the residue of his life. I. was long a lawyer practicing in courts in which he was sheriff or marshall, and had a great many transactions of a business character with him; very few men had equal opportunities of knowing him as thoroughly in all respects.” Being asked, “What was his reputation for capacity, integrity and fidelity in business transactions;” he answered: “In those particulars no man in the southwestern region of Virginia stood higher —indeed, I will say none so high.”
*Fraud must be proved by strong and clear evidence, and will never be presumed from facts which are consistent with honesty on the part of a person implicated by a charge of fraud. And such is especially the case when the person so charged, as *439 here, is a person of excellent general character.
Now let us apply that principle to this case, and inquire whether upon the pleadings and proof in the cause the parties to whom fraud is imputed in this case, or any of them, are guilty thereof.
It is charged in the bill that the trustee, Gibboney, and the purchasers, or at least one of them, Stuart, conspired together that the property in controversy should be sold for less than its value and what could have been gotten for it from others, by the trustee to the purchasers, for the joint benefit of all of them; and that it was accordingly so sold with a secret understanding between the parties to that effect. Such in effect is the charge repeatedly made in both bills, without here repeating the literal terms in which it is therein expressed. This charge is as positively denied by the only defendant who can deny it, the defendant Stuart. Gib-boney, the trustee, was dead more than three years before the suit was brought, and his widow and administratrix had no personal knowledge on the subject. Stuart was the only acting party in making the purchase, and is therefore the only purchaser whose personal information enables him to deny the charge. His denial of it in his answer is in this strong language: “On the part of the purchasers, respondent was the principal actor in the transaction of the business; and while he does not profess to have a personal knowledge as to all the details upon which complainant relies to found his grave charge of fraud and conspiracy, he claims to have as full a knowledge as any man could have as to the truth or falsehood of the charge itself. *With this full knowledge, and in view of all the responsibilities, legal, moral and personal, which he assumes, respondent declares the charge made by complainant, in all its length and breadth, and in every form and shape which it has assumed or may hereafter take, to be not only false, but to be so entirely without foundation in any reasonable probability, that its author will find it impossible to escape from the responsibility which, in the. estimation of all good men, attaches to the wilful and reckless defamer of the living and the dead.”
After such a denial in an answer, of a charge made against the respondent in the bill, at least two witnesses, or one witness and corroborating circumstances, are required to sustain the charge; and a fortiori does this rule apply when the charge, as is in this case, is one of fraud?
There is certainly no such evidence in this case to prove the charge of fraud as is required by the rule aforesaid, or as is required to prove a charge of fraud in any case. There is not a particle of evidence in the cause to show that Gibboney, the trustee had any interest whatever in the property sold to the purchasers, either after or before such sale. Tf any such interest had been provided for him by any understanding between the parties, according to the pretension of the complainant, surely there would have been some trace of it in the record. But there is none whatever. There has npver been, so far as the record shows, any claim to any such interest, either by the trustee, Gibboney, before his death in 1867, five years after the sale, or by his representatives since his death; nor has any paper been found, either among his papers or elsewhere, tending to show that such an interest had been, or was ever contemplated to be, provided for him.
*It is charged in the bill that tliei'e was no necessity for a sale of the property when the sale was made; that the sale was made for a less price than could have been gotten for the property at the time of the sale by selling it to others; and that the trustee became the agent of the purchasers in buying up claims against the trust fund, and actually furnished them money for that purpose, to enable them to become purchasers; and, it is insisted, that these alleged facts show that the trustee was interested in the sale as one of the purchasers; and that he and they were therefore guilty of fraud in regard to the sale, which makes it null and void.
The court is of opinion, that these charges are unfounded in fact; that there was a necessity for a sale at the time it was made; at least, such a necessity as made the sale proper; that the sale was made for the best price that could then be gotten for the property, so far as the record shows; and that the trustee did not become the agent of the purchasers in buying up claims against the trust fund, and did not furnish them money for that purpose.
As to the purchasers, it is specially charged that they, or at least one of them (Stuart), stifled competition with William King Heis-ltell as a bidder for the property, and were thus guilty.of a fraud which avoids the sale. The court is of opinion that this charge also is unfounded in fact. The character of this individual, his agency in this transaction, the conduct of the trustee towards him, and the motives of such conduct, are so clearly and truly set forth in the opinion of the learned judge (Keith) who decided this case in the court below, that we adopt and embody in this opinion his statement on the subject, which we entirely approve. It is as follows: “The burden of this case, however, rests upon William King Heiskell. He figured very conspicuously in this whole transaction, from beginning to end.
At an early period he appears as an importunate creditor, complaining that the trustee is acting in the interests of General Preston and the complainant; that the trust subject should, in justice to small creditors, lie sold; and notifying the trustee that in case of loss on account of his failure to sell he would be held to personal responsibility; then as a bidder for himself, then for himself and others; then selling his debts on the estate in the spring of 1863 to the defendants. Again, a bidder representing the Hurts and Dunns; then acting as the friend of Stuart, and seeking to purchase for his benefit; and now, since the war, placing the property at *440 a valuation greatly in excess of any one else; and swearing that at the very time of the sale to Stuart he was satisfied there was something wrong about it, and yet at this very moment of time advising Stuart that he is no longer a bidder, and that he thinks he (Stuart) can buy the property, and in the same letter calling upon him for a pecuniary favor, and within a month after the sale meets with Colonel Preston, and is ‘as silent as the tomb’ about his doubts and suspicions. Taking his entire appearance in this case from his first introduction into it, until his connection with it is closed with his deposition, and it strikes me as a tissue of improbabilities, inconsistencies, and contradictions. He is said to have been of high courage and unquestioned veracity, but intense prejudices, a bitter partisan, and very inimical to Stuart; this may serve to explain his conduct, without imputing to him intentional falsehood. This explanation protects his character as a man, but adds no strength to his statement as a witness. The inconsistencies and contradictions still exist, and tend greatly to impair, if they do not destroy, the value of his testimony. To what does his deposition amount, after all? That he desired to purchase this vast estate, when *he and those with whom he acted gave in to the assessor taxable property less than $50,000 in amount. The trustee would have been justified in not considering for one moment any offer from such a source. His duty and desire was to sell to men able and willing to comply with their engagements; not to men who had no single requisite necessary in a purchaser, except a readiness to assume responsibilities, which the trustee, extensively acquainted as he was with the people of that section, must have known they were unable to discharge. But suppose Heiskell had been able to purchase; how was he hindered, or ‘stifled,’ as the phrase is, by Stuart? Heiskell contracted with Stuart to buy the salt works from Gibboney, and Stuart agreed to take them from Heiskell at 200,000 bushels of salt. Heiskell was not limited or trammelled in any way by this arrangement; he could bid as much as he pleased; the fact is, the arrangement enabled Heiskell, for the first and only time, to become a bidder. But with him as a bidder is Stuart’s position compared, when it is charged that the conduct of Gibboney, whether by design or otherwise, had placed Stuart in a position of advantage as a bidder.
“There is a proposition in the papers to sell Heiskell the salt works for $425,000; he says it was not communicated to him, and that he was prepared to give more. In the first place, all the intrinsic evidence points to the fact that the substance of that offer, if not the identical paper, was disclosed to Heiskell, and that he quarrelled with Gib-boney, as appears from J. W. Johnston’s deposition, because the trustee would not accept currency, regardless of the wishes of creditors. Was not the trustee right in this matter? Could he properly have accepted a purchaser who could not satisfy the creditors? If he could provide for the payment of the debts he could have done so as well in Stuart’s hands as though they remained *with the original holders; indeed more conveniently, for he would have dealt with one man instead of many. If he could not provide for payment of debts satisfactorily to creditors, then he was a bidder the trustee was right in not accepting. How was the complainant injured?”
3. The court is further of opinion, that there was no breach of trust on the part of the said trustee in making the said sale, or in regard to the same in any respect.
We do not mean to question at all the principles in regard to the duty of trustees declared by this court in the case of Rossett v. Fisher, &c., 11 Graft. 492, cited and so much relied on in the argument of the appellant’s counsel in this case. On the contrary, we here reaffirm those principles as sound and salutary in their proper application. It is therefore true, as was there said, that “a trustee in a deed of trust is the agent of both parties, and bound to act impartially between them; nor ought he to permit the urgency of the creditors to force the sale under circumstances injurious to the debtor at an inadequate price. He is ‘bound to bring the estate to the hammer,’ as has been said by Lord Eldon, ‘under every possible advantage to his cestui que trusts;’ and he should use all reasonable diligence to obtain the best price.” Those principles were clearly applicable to that case; which was decided accordingly.
But they have little or no application to this case; the facts and circumstances of which are very different. Here, at the time of the execution of the deed of trust on the 7th day of July, 1859, Thomas L. Preston claimed to be the owner of the Preston salt works in the county of Smyth, and many thousands of acres of land thereto attached, supposed by some to be then worth little, if any, less than a half million of dollars: and also the owner of an undivided interest in the King’s salt works, and many thousands of acres of land thereto attached in the adjoining *county of Washington, which latter works and their appurtenances were supposed to be worth little, if any', less than the former, and were owned by the heirs of King or their assigns, of whom there were a great number, the said Preston being himself the assignee of some of them. These properties adjoin each other; and he had for many years carried on the operations of both, having rented the King’s salt works as tenant thereof, under a decree of a court of chancery which had control of the same, in a suit brought for that purpose. The result of his connection with the subject and his operations, was to involve him in an immense amount of debt, for most of which the property or his interest in it was encumbered by deeds of trust, judgments and otherwise. Finding it to be difficult, if not impossible no doubt, in his involved and hampered situation to continue the said operations, he leased out both *441 works to lessees residing in New York, for the term of ten years from and after the 1st day of January, 1859, at the annual rent of fifty thousand dollars, including in such lease the whole of the King’s works; although he had, comparatively, a small interest therein, and only a portion of the other parties interested gave their consent to such lease: and although the “King’s works” were then under the control of a court of chancery, whose consent to the lease was neither obtained nor asked for. This lease had not been more than about six months in existence when the pressure of the pecuniary troubles and embarrassments of said Preston became so great that he found it necessary to make an immediate arrangement to have his whole estate converted into money, and the proceeds of sale and collection applied, as soon as possible, to the payment of his debts, at least so far as the said proceeds would go. And he accordingly determined to pursue that course.
The question then arose whether he would pursue that course *by his own agency or that of another. He had acted only in proper person in his management of his affairs before; but his signal failure in that respect admonished him of the necessity of finding, if possible, a suitable person to act for him in attending to business of so great importance and of such difficulty. In considering what person it would be best to select for so important an office he and his friends met with no difficulty, but determined at once, and with singular and wonderful confidence and unanimity, to select for that purpose Robert Gibboney of the county "of Wythe, a gentleman of fortune and of the highest character for integrity, diligence, energy, punctuality and business capacity generally. And he consented to accept and undertake the agency. Accordingly the deed of the 7th day of July, 1859, before referred to and described, was executed.
It is only necessary to read that deed to form a correct idea of the extremely important and difficult agency which Gibboney accepted in agreeing to become the trustee in the deed. So many persons were interested in it that it was extremely important that the trustee selected should have, if possible, the confidence of all of them; and yet such seems to have been the fact. And what is of infinitely more importance is, that he seems fully to have deserved it. He was clothed by the deed with the greatest powers and discretion in the execution of the trusts thereby declared; almost if not quite equal to those possessed by the grantor before its execution. And yet nobody complained that too much power or discretion was thereby given him, and nobody attempted to arrest him in the execution of the trusts, or seemed at all to doubt that the very best possible thing had been done in the execution of the deed, for the benefit of all persons concerned therein; and what is most remarkable is, that numerous as were the creditors secured by the deed, great as was the amount of the debts *due them, various as was the nature of their encumbrances and claims, none of them have ever brought a suit against the trustee, or shown or felt, so far as has ever been heard, the least dissatisfaction with the trustee’s management of the business. There is but one person interested in the trust who has shown any such dissatisfaction, and that is the grantor; and he never showed any such dissatisfaction until several years after the trustee’s death, which was in 1867, eight years after the execution of the deed. On the contrary, although he was perfectly familiar with the trust subject, having managed it for many years, and knew all about the debts secured by the deed, and saw how the trustee was executing the trust, yet he found no fault and made no complaint, but seemed to be perfectly satisfied with what was done until shortly before the institution of this suit in 1870, eleven years after the date of the deed of trust.
Perhaps there never was a trust attended with more difficulty or managed with more success than the trust in this case. It was believed, no doubt by many, and certainly by the grantor himself, that the trust subject, with the best possible management, could not be made to afford enough money to discharge the debts thereby provided for, much less to leave a surplus for the benefit of the grantor. He believed himself to be hopelessly insolvent, but honestly surrendered all his property for the payment of his debts. The trust was managed during a period of unparalleled difficulty. It commenced shortly before the war and continued during the whole war, and yet it was managed with such extraordinary success that not an atom of the vast trust subject was lost by being turned into Confederate money or otherwise, and not a dollar of the vast amount of debts secured by the deed remains unpaid or unprovided for, and not one of the numerous creditors thereby secured *has made any complaint, or has any cause of complaint. On the contrary, the trust was managed by the trustee with such signal success, that only a few years after the creation of the trust, say three or four, it was nearly completed; the trust subject, or nearly all of it, was converted into money, the debts secured by the deed were all paid, or provided for; twenty-five thousand dollars were paid to the grantor’s wife in consideration of her release of her contingent right of dower in the trust subject, and a large surplus, amounting to about $75,000, was left for the grantor himself. No one seems to have been more surprised at or better satisfied with this result than the grantor. He expressed himself in very strong terms on the subject to his friends, especially to General Joseph E. Johnston. Beverly R. Johnston, a brother of the General, in his deposition, says: “Mr. Preston came, I believe, to see my brother at his lodgings, and found him and me together. Mr. Preston was on intimate terms with General Johnston, and seemed to have come to communicate with him a transaction which had then very recently occurred, which was the subject of extreme gratification and rejoicing to him. I was present *442 during the entire conversation, which, from its subject, was interesting to me, and the substance of which I distinctly recollect. Mr. Preston addressed himself to General Johnston; said that he had had a settlement with Robert Gibboney, his trustee, to whom his entire estate and effects of every description had been conveyed. He said that when the assignment to Gibboney was made he had very little expectation of the trustee achieving more than the payment of his debts, but that owing to the singular skill, energy and fidelity of Mr. Gibboney, a result had been reached altogether beyond his own hopes or the expectation of his friends. He. then proceeded to state what that result was. Pie said that it appeared that there remained to *him, after satisfying or providing for all debts and liens, upwards of $†0,000 in his own right. This was exclusive of $25,000 which was secured by the said deed to Mrs. Preston (his wife) in consideration of her relinquishment of her contingent right of dower. Of course at this distance of time (his deposition was taken in January, 1811,) I do not profess to give Mr. Preston’s language, but the substance of his statement in my words. No language could be stronger than that which he used in regard to Mr. Gibboney’s skill, diligence and fidelity in the execution of the trust, and his own gratitude for the services rendered by him.” Another witness, R. M: Page, county judge of Washington county, in his deposition, says: “I am acquainted with complairiant; about the time James C. "Campbell was appointed trustee in the room of Gibboney (who'had died), I think a short time thereafter complainant was in the county clerk’s office of Washington county, myself and James C. Campbell being present, and said to us, speaking of his failure, that it was the largest failure and grandest pay out that had ever occurred in this section. I do not pretend to give the exact language, but what complainant said was in effect what I have stated. The impression made upon me was, that Mr. Preston congratulated himself that his estate had been more than sufficient to discharge his indebt-ednéss. I think that Mr. Preston said that about the sum of $75,000 had been realized over an amount sufficient to pay his debts.”
After such strong evidence of the trustee’s faithfulness and success, and of the grantor’s entire satisfaction with his management of the trust, and the result of it, manifested during the whole of the trustee’s life after the date of the trust deed, he surely ought not to be convicted of a breach of trust except upon the strongest evidence.
*The complaint of the grantor now is that the trustee sold the salt works too lew; that he might have sold them at a higher price than he did; that he sold them at a private instead of a public sale, and 'without giving public notice of the sale or affbrding others who wished to buy an opportunity of doing so; and that he favored Stuart, over all other competitors for the property, by assisting him, and him alone, in becoming the owner of debts secured by the deed by paying Confederate money for them. Ret us consider these objections briefly.
We think that the trustee, sold the property at the highest price he 'could obtain for it. There were very few who could and would buy it.. There were only two persons who seemed to be able to do so and were that way disposed — General John S. Preston, and Stuart for himself and his associates. General Preston had control of $170,000 of the debts charged on the property by the first lien thereon, which enabled him to buy it. He considered the property to be worth $300,000, and no more; but for the sake of his brother, Thomas L,. Preston, he offered $350,000 for it. He would, however, give no more. And when the trustee refused that offer because too low, and informed him that Stuart was willing to give $425,000 for it, he expressed his satisfaction on his brother’s account, and seemed to be anxious that a sale should be made to Stuart accordingly; which was done. That Thomas L,. Preston considered that an ample price, and as much as could be gotten for it, is evident from the fact that he was very anxious that the property should be sold to his brother, General Preston, at a much less price. But the trustee was unwilling, because the highest price that General Preston would have given would not have been enough to pay the debts. And Gibboney, being the agent of both parties, debtor and creditors, felt *himself bound to get the highest price possible for the property, and at least enough, if possible, to pay all the debts.
As to others who have been referred to as likely to have become purchasers or bidders, if an opportunity had been afforded them, we have seen how improbable, if not impossible, it was that Heiskell would have become a purchaser; and Palmer, of Richmond,'- was hardly able to become himself the sole purchaser, and had formed no connection with others to make the purchase. He never made an offer for the property, even on his own account, and what he said to the trustee on the subject long before the sale, was no doubt regarded by the latter as not being serious, and forgotten by him long before the sale was made.
As to the objection that the sale was a private ond not a public one, and was made by the trustee without giving public notice thereof, the deed expressly gave him power to sell publicly or privately, as he might deem best, and he deemed it best, as it certainly was best, to sell at private sale. The fact is, a public sale could not have been effected, at least without endangering a great sacrifice of the property. The debts charged on the property, and indeed all the debts secured by the deed, were good money debts, and of course could not be paid in Confederate money — at least without the consent of the creditors. A public sale for good money could not have been effected at all, and at *443 least not without a very great sacrifice, and a public sale lor Confederate money without any previous agreement of the trust creditors to receive such money in payment of the debts due to them, would have been a palpable breach of trust. A private sale, if any sale was to be made, was therefore necessary. hi fact no person knew that better than the complainant himself, who had co-operated "-with the trustee in endeavoring to effect a private sale, first to the commonwealth, and then to General Preston. As to giving public notice that the property was for sale, there was no fact more notorious about the time the sale was made. The deed was made for the very purpose of having the property sold and the trust debts paid out of the proceeds of sale. So that it was for sale from the very date of the deed and until it was sold. The only motive for delay was to receive offers for it until one was made which the trustee might deem sufficient to warrant its acceptance. It was most notorious that an effort had long been made by the trustee and the grantor to sell the property to the state legislature, and few in the state could have been so ignorant of public affairs as not to be aware of that negotiation, and therefore that the property was for sale. Certainly nobody who had the remotest idea of ever becoming a purchaser of it, could have been ignorant of the fact. There could, then, have been no occasion for any further notice that the property was for sale.
As to the objection that the trustee favored Stuart over all other competitors for the property, by assisting him and him alone, to become the owner of debts secured by the deed by paying Confederate money therefor, we think this objection is not well founded. So far as the trustee may have given any aid or countenance to Stuart in this respect, it was not with a view _ of serving two masters, within the meaning of the maxim of law or language of scripture, on that subject on which so much reliance has been placed in the argument. The agent, Gibboney, seems to have had hut one inasier in the whole transaction of this agency, and that was his principal, Thomas L. Preston. If he seemed at any time or in anything to serve Stuart in the matter, it was only that he might render more effectual service to Preston. *As was said by Gibboney in announcing to Preston the sale that had been made to Stuart, he, Gibboney, in making said sale, had no doubt been governed alone by what he conceived to be the interest of Preston. That was certainly his duty, and he could not have been governed hy any other motive without the most criminal breach of trust and treachery. He certainly had no interest of his own to conserve by such a course. Under such circumstances, why would he have preferred the interest of Stuart to that of his principal, Preston? To convict him of doing so ought certainly to require the strongest evidence.
The trustee seems to have set out in the execution of the trust with two principles for his especial guidance, viz: to sell the salt works only for such money as would be received by the creditors in the discharge of their debts, and only at such price as would be at least sufficient to discharge all the trust debts, if not leave a surplus for the benefit of the grantor. These were wise and just principles, and were strictly adhered to by the trustee. We have seen the beneficial result.
The fact is the trustee could not otherwise have made a sale of the • property which would have attained that result. General Preston, the only other person than Stuart who could have made the purchase, had made his highest offer, which was not sufficient tor the purpose which the trustee had in view. He (the trustee) had therefore to find another person who could and would be a purchaser at a sufficient price. And Stuart was the ¡only person whom he could find to answer that description.- Stuart could do so only because he had acquired a very large amount of the trust debts, by negotiating with the creditors for- payment of them in Confederate money. Th-is operation required a great deal of time- Stuart, therefore, who desired to purchase the property, commenced *the operation of acquiring trust debts at an early period, and persisted in it until he ‘was in a condition to make the purchase. Gibboney seeing that Stuart was the only person who was likely to be able and willing to make the purchase at a sufficient price, .and considering it his duty to sell as soon as he could do so at such price, may have facilitated as far as he could, and properly so, the desire and intention of Stuart to become the purchaser. If he did, it does not at all follow that he thereby violated his duty as trustee, but he may have pursued that means of promoting a sale, and thus have done his duty.
Two of the preferred creditors to whom large amounts were due by Preston, were his brothers-in-law, Colonel Watts and Mr. Saunders. They received payment of the debts due them in Confederate money from Stuart, to' whom they assigned the said debts. Preston must have known of these transactions at the 'time, for he frequently saw and conversed with his said brothers-in-law, and was in the army with one of them, Colonel Watts, when the said transactions occurred. In fact, he no doubt knew of most of the like transactions, which were not concealed from him and were obviously for his benefit.
There are various other grounds on which it is contended that the trustee was guilty of a breach of trust in making the sale.
They are thus summed up in the amended and supplemental bill.
“First. Because the legal title was outstanding.
“Second. Because the liens anterior to the deed of trust were unascertained.
“Third. Because the debts under the deed of trust were neither ascertained by the *444 deed not otherwise, and had been reduced by payments.
“Fourth. Because the property ^old was subject to a lease, which had seven years to run, and was a reversion *dependent thereon, and according to the opinion expressed by the defendants, the lease was a clog to the sale.
“Fifth. Because the King’s salt works was an undivided reversionary interest, in litigation in the courts, and the rents passed with the- reversion, and was, as defendants themselves claim, subject to set-off for damages, which made it uncertain and a source of controversy.
“Sixth. Because the stay law forbade it, and a sale under its provision was made under a cloud.
“Seventh. Because the Other assets _ in hands of the trustee, with the accruing rents in gold, would have paid all the debts which were due (except the Preston and Coccce debts, which had been postponed by agreement), and a sale of no part of the corpus was needed. Of all these facts the purchasers hatl full notice.
“For these reasons complainant charges chat the trustee not only had no power to sell, but was by law and rules of equity forbidden to sell, and was by his duty re-nuired to refuse to sell, and if he did not refuse, could have been enjoined from selling, and that his duty required him to apply to a court of equity to have the trust administered and sale made under its decree.”
It is a sufficient answer to all these grounds (though other answers might be made), that this is not a case of an ordinary deed of trust to secure creditors, to which the principles aforesaid, or some of them, might be applicable, but it is a case of an agency voluntarily created by a debtor for the immediate conversion of his whole estate into money and the application of the proceeds thereof to the payment of his debts. It is a case between a principal and his agent, to which none of the creditors of the principal are parties, and the terms of the agency and the duties of the agent are prescribed by the deed *of trust. There can be no doubt -but that the' debtor, without making any deed, might have proceeded in proper person to convert his estate into money and apply the proceeds to the payment of his debts, according to the liens and claims of his creditors; at least unless they interposed to prevent him, and at all events if they acquiesced and concurred therein. Certainly the debtor could not in such a case, on any of the grounds before stated, cause a sale made by him to be set aside by a court oí chancery. For the same reason and upon the same principle, a debtor may make such a conversion of his estate and application of the proceeds by means of an agent constituted by him for the purpose, and if the creditors are satisfied and do not complain, the debtor cannot undo the act of his agent any more than he could his own act if he had done it in proper person. No creditor is complaining in this case. The debts are all satisfied or provided for, and the controversy is confined to the debtor and trustee, the principal and his agent. The acts of the agent, complained of by the principal, were expressly authorized and required in the deed of trust to be done. There could, therefore, be no breach of trust in doing them.
In regard to the charge in the bill, that the sale in June, 1862, was made too soon, and that the trustee ought to have adopted the suggestion made to him by the complainant Preston, in two letters dated in (April, 1862, proposing that the sale be deferred one year longer — suppose it had accordingly been so deferred by the trustee, and the public enemy had in the meantime captured and destroyed or materially damaged the salt works, and thereby prevented the payment of a large amount of the trust debts' — -how could the trustee have defended himself against the claims of the disappointed creditors upon the ground that he had violated his duty in not selling *the salt works in June, 1862, at the cash price of $425,000, payable in gold or its equivalent, which was' sufficient to pay all the trust debts and afford a surplus of seventy-odd thousand dollars for the grantor; and, instead of doing that, in deferring a sale for one. year, when the property was exposed to so many dangers in the meantime, and especially the danger from the act of the public enemy before referred to? There was no property in the Confederate States the destruction of which was more desired by cur enemy than these salt works; for there was none which contributed more to the support of our armies and the sustenance of our people during their great struggle for independence. It was greatly to be feared, therefore, that this property might, at any time, be so captured and destroyed. In fact, it was captured and greatly damaged by the enemy at a later period, and after it was purchased by Stuart. To be sure it was not so captured and destroyed or damaged within a year after the sale; and it might have been better if the sale had been deferred for a year. But we must judge as to the propriety or impropriety of the conduct of the trustee, not from our present standpoint, but by placing ourselves in his situation when he made the sale, and looking at all the circumstances which- then surrounded him.
4. The court is. therefore, of opinion that as the trustee had power to make the said sale, and there -was no fraud in regard to the said sale, on the part either of the trustee Gibboney, or of the said purchasers or either of them, and no breach of trust on the part of the said trustee, as aforesaid, it follows as a necessary consequence, that the said sale is valid.
5. But the court is further of opinion that even if the said sale had been voidable and invalid it would have been confirmed and made valid by the agreement executed *by the said Thomas L. Preston for that purpose on the 1st day of October, 1862, as well as by numerous other acts of *445 confirmation and acquiescence on his pari.
By deed oí that date, the said Preston expressly ratified and confirmed the sale of the Preston salt works, and the interest oí the said Preston in the King salt works estate, as made by his trustee, Robert Gibboney, to Stuart, Palmer and Parker. And that deed was made upon valuable consideration received by said Preston from said Stuart, Palmer and Parker; though no such consideration was necessary to its validity. That ratification and confirmation was never denied and repudiated by said Preston until long after the death of Gibboney, In 1867. On the contrary, after that event, and on the 18th day of April, in that year, the said deed of confirmation was acknowledged by the said Preston for record before a justice of the peace, upon whose certificate of such acknowledgment, the said deed was afterwards duly recorded. All the material facts connected with the said sale were well known to the said Preston and his counsel at the time of the said confirmation; for he had the aid of able counsel in making the said confirmation. tie and his said counsel had ample time and opportunity fully to inform themselves of every material fact of the case of which they may possibly have been ignorant; and it will be presumed that they did, as they certainly ought to have done so, at least in the absence of very strong evidence to the contrary. There was no concealment nor any attempt at concealment, by Gibboney, or Stuart, or any other person, of any material fact of the case, from said Preston, nor was there any conceivable motive for any such concealment.
Without enumerating other acts of confirmation of, and acquiesence in the said sale, on the part of the said *Preston, we may now well ask how it can be said that the sale, even if not otherwise valid, was not fully ratified and confirméd by the said Preston?
In any view which can be taken of the case we are therefore of opinion that the said sale is a valid sale, and that the decree of the court below to that effect must be affirmed.
The original and amended and supplemental bills also seek to surcharge and falsify the settled accounts of the trustee, Gibboney, and to obtain a decree for a further and final settlement of the account of his trusteeship. The circuit court considered that the complainant is entitled to no relief in that respect, and therefore dismissed the bills in regard to that matter also; and this court is of opinion that the circuit court did not err in so doing.
The trustee was not only active, diligent and prompt in the execution of his duties in making sales and collections of the trust property and money, and payment of the trust debts, and disposition of the surplus, but was prompt and regular in settling his trust accounts. Five settlements were made of the said accounts — four of them in the lifetime of the trustee and the fifth after his death. All of them were made by a commissioner of the court, were returned and filed for exceptions, and all of them but the last were unexcepted to, and were confirmed and recorded. Copies of these accounts are filed as exhibits with the oidginal bill, and are marked X, Y, Z, Z2 and Z3. X, Y and Z are the main accounts, and embrace almost all the trust transactions. They were settled by Commissioner Matthews, who seems to have been a very skillful commissioner. The dates of these settlements respectively are September 6th, 1860, 21st September, 1861, and 4th November, 1862. The last of these three accounts embrace, among many other items, a credit to *the trustee for $40,907.45 paid by him to Thomas L,. Preston out of the surplus of the trust fund, and other similar credits are embraced in the subsequent settlements. There can be no doubt but that the complainant, Preston, was fully aware of the settlements at the time they were made, being deeply interested in them, and could have informed, and no doubt did inform himself as to every item of the accounts which did not fully explain itself; and he did not except to any of the accounts, except the one last settled as aforesaid, but silently acquiesced in the confirmation by the court of all the rest. The strong, if not the irresistable, presumption, therefore is, that he considered all the rest to be right.
Still, he may not have been concluded, according to the authorities, from filing a bill to surcharge and falsify these accounts; but in order to do so it devolved on him to specify in his bill the grounds of surcharge and falsification, and to prove them by evidence, unless, indeed, there are errors on the face of the account, in the manner of stating it, which will not admit of explanation by evidence, dehors the account. There are no charges in the bill, much less is there any evidence in the lecord, of any such grounds of surcharge and falsification. The only grounds relied on in the bill are certain supposed errors on the face of the accounts. But these are either no errors at all, or at all events they' may not be, and will be presumed not to be in the absence of evidence to prove that they were. As to the cross entries complained of, they were proper if not necessary. As to the charge of the trustee’s commission of three per cent, on the amounts charged to the trustee in these cross entries as having been received by him, it was a proper charge, at least under the circumstances of this case. Though the complainant examined these accounts, together with his counsel, in *1865, and often afterwards before he determined to institute the suit, yet he never objected to any charge against him in them prior to the last settlement, except a charge of commission on the debts as to which the creditors refused to receive the amount of them in Confederate money; and he had previously agreed in writing to that charge.
In regard to any right of the complainant to a decree for a further settlement of the trusteeship account, the court is of opinion that such a decree was unnecessary, and *446 would have been improper under the circumstances of the case. Gibboney was the trustee and agent of Preston for the conversion of the latter’s estate ¡into money and the payment of his debts as far and as soon as possible. As soon as this could be done, the surplus, if any, of the trust property or money would result and belong to Preston. The purpose of the trust'would then be accomplished. The trustee succeeded in three or four years in converting the estate into money, or at least enough of it to pay'all the debts. But he could not pay all, because some of the creditors refused to receive Confederate money in payment of their debts. And, moreover, there was a controversy as to the persons entitled to the amount of the debt which had been claimed by General Preston, 'or at least as to some of them, and the proportions in which they were so entitled. If this difficulty had not existed, or could have been surmounted, there would no doubt have been a final settlement and mutual releases in regard to the trust account in 1863 or ’64. But as that was not the case, the trustee had to settle his account as far as possible, and leave the balance of the purchase money of the salt works in the hands of the purchaser's for the payment of the remaining trust debts as soon as the controversy in regard to them could be settled. The matter then became a matter between Preston, Stuart, and the trust creditors who had refused *to receive
Confederate money, and had to await the determination ' of the controversy between them. That matter can and will be determined by the court below in the decision of the suit upon the cross bill, which is still pending in that court.
The court is further of opinion, that the circuit court properly declined to dispose of the case upon the cross bill; not only on account of the controversy aforesaid, but also because it is a proper and necessary bill for specific execution by the purchasers aforesaid.
Upon -the whole, the court is of opinion that there is no error in the decree of the circuit court, and that the same ought to be affirmed.
Decree affirmed.